ARRUE v. CONSOLIDATION COAL CO. et al.

(District Court, S. D. New York. November 9, 1917.)

No. 151.

SHIPPING ☞56—BREACH OF CHARTER—LIABILITY.

A charterer of a schooner then lying in Venezuelan waters, where she had been for six weeks, subchartered her to carry a cargo of cocoanuts from a Cuban port to New York, the vessel to proceed at once to enter upon the charter, and to be tight, stanch, strong, and in every way fitted for the voyage. Because of having lain so long in tropical waters, her bottom was foul with barnacles, and from that cause and want of ballast which could not be obtained, she was unable to make the Windward Passage, but went around Cuba and stopped for cleaning at Key West, with the result that she did not reach the port of loading for two months and the cargo suffered serious damage. *Held,* on the evidence, that the owner and master were not in fault, but that the delay in arrival was a breach of the subcharter, and rendered the charterer, which was chargeable with knowledge of her probable condition, liable to the subcharterer for the damage.

In Admiralty. Suit by M. S. Arrue against the Consolidation Coal Company, with the United Line, Incorporated, impleaded. Decree for libelant against the Coal Company alone.

William F. Purdy, of New York City, for libelant.

James K. Symmers, of New York City, for respondent Consolidation Coal Co.

T. Catesby Jones, of New York City, for respondent United Line, Inc.

MANTON, District Judge. On the 28th of December, 1915, the United Line, Incorporated, chartered the schooner Bayard Hopkins to the Consolidation Coal Company for two round trips from Baltimore, Md., to Carenero, Venezuela. On the 28th of December, 1915, the Consolidation Coal Company, as agent, chartered the Bayard Hopkins to the libelant, to carry a cargo from Baracoa, Cuba, to New York. This latter charter party was made while the Bayard Hopkins was at La Guayra. The ship arrived on her first voyage at Carenero on November 14, 1916, at 6:30 p. m. She finished discharging cargo on November 27th, and arrived at La Guayra November 28th. She remained at La Guayra, awaiting orders from the charterer, until the master was notified to proceed to Baracoa on December 31st.

When the vessel left the port of New York and proceeded to Venezuela, she was tight, stanch, and strong, as contracted for in the charter. On the voyage from La Guayra to Baracoa, the ship encountered heavy, rough weather before she arrived at the Haitian coast, resulting in damage to her sails. While lying in tropical waters during this waiting period of almost a month and a half, her bottom became foul with barnacles as large as hens' eggs. This impeded the progress of the vessel, so much so that the master concluded it would be impossible to get through the Windward Passage, the shortest route to Baracoa from La Guayra. The master first attempted

to make his way through the Windward Passage, but gave up the effort as unsafe, in view of the prevailing northeasterly wind and the foulness of the bottom of the schooner. At this time she had no ballast, and the credible evidence warrants the finding that there was no ballast to be obtained at the nearby ports where she might call.

There was no ship railway where the vessel might be docked (short of Key West) and the barnacles removed from it. The ship made for Key West, and arrived there on February 5th, and was fumigated on February 8th. Here her bottom was cleaned, new sails were furnished, and she completed her voyage, sailing from Key West on February 24th, and arriving at Baracoa on March 2, 1916. There is some testimony that ballast was obtainable at a port near the course of the vessel, but I think the testimony offered on behalf of the respondent United Line, Incorporated, is the more credible and sufficiently negatives the claim of the libelant that ballast was obtainable. I am satisfied that the master of the ship did all that was reasonably to be expected of him in making this voyage, and that the failure to take the shorter course was not due to any neglect or fault on his part, but due to conditions for which he is not responsible.

The libel was filed against the Consolidation Coal Company, and, under admiralty rule No. 59, the Consolidation Coal Company has brought in the ship. I consider this ill-advised, for the evidence does not warrant a finding against the United Line, Incorporated, and the decree will go in its favor.

The claim of unseaworthiness of the vessel, in the sense that her sails were defective, or that she was unable to make the course through the Windward Passage, as other vessels did, is not supported. It is true that, if the bottom was clean and she had ballast, she could have made this course and thus have arrived at Baracoa in seasonable time. This finding, however, does not release the Consolidation Coal Company from responsibility. The Consolidation Coal Company made its contract, when it must be charged with knowledge of the conditions as they existed, or else it failed to obtain information which was obtainable, and which would inform it of the condition of the ship at that time. For example, it did know, or should have known, that the vessel was lying in tropical waters for this period of time, where her bottom was likely to become foul. There is no evidence to indicate that it made any inquiry as to the condition of the vessel after its period of six weeks in tropical waters. The evidence shows it made this contract with the libelant, in which it obligated itself to furnish the Bayard Hopkins to carry a cargo of cocoanuts, and covenanted as follows:

"Said vessel to be tight, stanch, and strong, and in every way fitted for such a voyage and receive on board during the aforesaid voyage the merchandise herein mentioned. The said party of the second part doth engage to provide and furnish to the said vessel a full cargo under and upon deck of cocoanuts and/or other ordinary lawful merchandise."

The delay in reaching the port of Baracoa was an unreasonable delay within the reasonable construction of the phrase "to proceed at once to enter upon this charter." In my opinion the Consolidation

Coal Company cannot offer, as its excuse for its failure to carry out its contract, the commendable excuses offered to the court by the impleaded United Line, Incorporated, for here it entered into a solemn contract when it knew, or should have known, of the conditions confronting the master of the ship, which resulted in delay in the voyage. The failure to proceed as reasonably expected within the terms of the contract is a breach thereof, for which the Consolidation Coal Company should respond for the loss sustained by the libelant. The libelant's cargo was damaged, and there is ample proof to sustain his claim of loss, to wit:

Increased freight.................................................. $ 415 00
Deterioration on arrival in Baracoa.............................. 1,975 60
Cables to New York and Guantanamo............................ 50 00
Loss of cargo on arrival in New York............................ 1,040 00

—making a total sum of $3,480.60, for which a decree may be entered against the Consolidation Coal Company.